BRIAN J. STRETCH (CABN 163973)
United States Attorney

DAVID R. CALLAWAY (CABN 121782)
Chief, Criminal Division

BENJAMIN KINGSLEY (NYBN 4758389)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6937
    FAX: (415) 436-7234
    benjamin.kingsley@usdoj.gov

Attorneys for the United States

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO. CR 15-437 CRB |
| Plaintiff, | ) ) ) | **UNITED STATES' SENTENCING MEMORANDUM** |
| v. | ) ) | Sentencing Date: June 6, 2016 |
| CHARLYNE BASADA, <br>     a/k/a "Charlyne Melendres," | ) ) ) | Sentencing Time: 10:00 a.m. |
| Defendant. | ) ) | |

## INTRODUCTION

On January 13, 2016, defendant pleaded guilty to Counts Three and Seventeen of the Indictment, charging her with bank fraud, in violation of 18 U.S.C. § 1344, and aggravated identity theft, in violation of 18 U.S.C. § 1028A. PSR ¶¶ 1–2. That same day, the parties entered into a plea agreement pursuant to Rule 11(c)(1)(B). The parties agreed to a Sentencing Guidelines Offense Level of 20, in addition to the mandatory consecutive two-year term of imprisonment required by 18 U.S.C. § 1028A. The parties reached no agreement regarding defendant's criminal history.

U.S. Probation has recommended that defendant is in Criminal History Category III, and has recommended an Offense Level of 20, resulting in a fraud Guidelines range for defendant of 41 to 51 months of imprisonment, in addition to the two-year consecutive mandatory minimum imposed by

**SENTENCING MEMORANDUM**

§ 1028A.  Probation recommends a downward variance, based on § 3553 factors, from 65 months to a sentence of 48 months of imprisonment, followed by five years of supervised release, $1,063,975.78 in restitution, and no fine.

The government agrees with Probation's calculation of the defendant's fraud Guidelines Range of 41 to 51 months in addition to the two-year mandatory minimum term for § 1028A, resulting in a total Guidelines range of 65 to 75 months of imprisonment.  The government recommends a sentence of 65 months of imprisonment, at the low end of the total Guidelines range, followed by five years of supervised release, $1,076,975.78 in restitution, and no fine.

## DISCUSSION

### A.    Offense Conduct

Defendant worked as a bookkeeper at four separate employers from 2009 through 2015, and defrauded each of them of tens of thousands or hundreds of thousands of dollars, for a total loss of approximately $1,085,000.

#### *1.    JVM Lending*

From December 2009 to June 2011, defendant worked as a bookkeeper at JVM Lending, a small mortgage lending company in Walnut Creek owned by J.V. and his wife, H.K.  PSR ¶ 7.  From April 2010 until she was fired in June 2011, defendant embezzled at least $21,000 from JVM and its owners, using the corporate JVM checkbook and J.V. and H.K.'s personal checkbook to write fraudulent checks to herself.  PSR ¶¶ 7–9.  She covered up her fraud by writing the memo lines on the fraudulent checks as though they were legitimate bills—for example, for college tuition for the owner's child—having J.V. sign the checks thinking they were really to pay those bills, and then, after J.V. had signed the checks, filling in the payee as "cash."  PSR ¶ 9.  Defendant then deposited the checks in her own account.  PSR ¶ 9.  As a result of her fraud, legitimate bills went unpaid.  One such fraudulent check is the basis of the aggravated identity theft charged in Count 17.

#### *2.    Forum Design*

After she was fired from JVM, defendant was hired as a bookkeeper a Forum Design, a small architecture firm in San Francisco owned by W.S., in July 2011.  PSR ¶ 10.  Defendant's real, authorized pay was $25 per hour for 12 hours per week, paid in paper checks.  PSR ¶ 10.  From October

SENTENCING MEMORANDUM

2011 through April 2014—approximately two-and-a-half years—she used her authority as a bookkeeper to authorize fraudulent direct deposit transfers and checks from Forum Design for a total of an additional $675,000. PSR ¶ 11. To cover her tracks, she initiated a number of these payments as though they were legitimate reimbursements or other legitimate payments. Because she was taking such a large volume of money from the company, many bills, including contributions to the Forum Design employee retirement plan, went unpaid. Dkt. 30 at 3–4 (plea agreement).

### 3. Korts & Knight

After she was fired from Forum Design, defendant again obtained work as a bookkeeper, this time for Korts & Knight, a small interior design firm in San Francisco, in June 2014. PSR ¶ 12. Defendant's real, authorized pay was $27 per hour. PSR ¶ 12. From July 2014 through February 2015—this time, in seven months—she initiated approximately $146,000 in fraudulent QuickBooks payments to her bank account. PSR ¶ 12. Again, she covered her tracks by mislabeling her payments, and the volume of her theft caused many bills, including payments to Korts & Knight's employee retirement contribution plans, to go unpaid. Dkt. 30 at 3–4.

### 4. Becker Electric

Finally, after she was fired from Korts & Knight, she quickly obtained another job as a bookkeeper, this time for Becker Electric, a small electrical contractor in San Francisco, in February 2015. PSR ¶ 14. Again she had access to QuickBooks, and again she used that access to steal money, taking over $240,000 in a mere six months. PSR ¶ 14. Defendant was indicted in this case on September 10, 2015, and arrested and released on bond on September 11, 2015, yet she continued to embezzle from Becker for another two weeks—taking approximately $10,000 after signing her bond—until the government uncovered her ongoing fraud and moved to revoke her bond. PSR ¶ 15.

**B.    The Defendant's Guideline Calculation**

The government agrees with Probation's calculation of the Guidelines. The fraud Guidelines are set forth below:

|   |   |   |
|---|---|---|
| a. | Base Offense Level, § 2B1.1(a)(1) | 7 |
| b. | Loss or gain amount, § 2B1.1(b)(1)(H) | +14 |
| c. | Abuse of trust, § 3B1.1(b)(1)(H) | +2 |
| d. | Acceptance of Responsibility | -3 |
| e. | Adjusted offense level | 20 |

**SENTENCING MEMORANDUM**

Defendant took advantage of her position as a bookkeeper and embezzled over $1 million.  PSR ¶¶ 6, 17.  This results in a +14 enhancement for the loss amount and a +2 enhancement for defendant's abuse of a position of trust.

Given that defendant's Adjusted Offense Level for fraud is 20, and her Criminal History Category is III, her Guidelines range for fraud is 41 to 51 months.  Defendant also pleaded guilty to a violation of 18 U.S.C. § 1028A, which requires a two-year sentence to be imposed consecutively to any sentence imposed for her fraud conviction.  As a result, her total Guidelines range is 65 to 75 months of imprisonment.

### C. A Sentence of 65 Months Is Sufficient but Not Greater than Necessary to Comply with 18 U.S.C. § 3553(a)

#### 1. *Nature and Circumstances of the Offense*

Defendant's fraud is egregious and justifies a very lengthy prison sentence.  For approximately five-and-a-half years (or approximately 65 months, the length of the sentence requested by the government), defendant serially defrauded four separate employers out of more than $1 million.  She abused the trust these employers placed in her, taking advance of her position as a bookkeeper.  As she found she could get away with it, she became more brazen with her fraud, taking greater amounts of money over shorter periods of time.  She continued stealing from her final employer, Becker Electric, even after she had been indicted and released in this case.

Defendant's conduct was extremely pathological. She lied repeatedly and directly to her employers and colleagues—the people who trusted her with their money, including their retirement contributions—and then, when caught by each employer and fired, lied again to a new set of employers and colleagues.  This was not a faceless embezzlement of the funds of a large organization, but face-to-face lies and deception told to those surrounding her every day.  In each instance, she was caught by her employer, eventually—and fired—yet she barely paused to reflect.  Instead, she offered excuses for her theft while simultaneously seeking and gaining new employment as a bookkeeper and continuing her fraud.  Though some of her excuses to her former employers cited family or other hardship as motivating her theft, these excuses were lies.  Instead, defendant's bank records establish that she used the money both on living expenses as well as "meals at restaurants, shopping, tickets to sporting events,

**SENTENCING MEMORANDUM**

concerts and various trips, including many to casinos," and that she withdrew a high percentage of the money in cash, with some large withdrawals made shortly before trips to Reno, Tahoe, or other gambling destinations. PSR ¶ 16. She took money that was needed by her employers to make ends meet, and used it to indulge herself.

Along those lines, the victim impact in this case is substantial. Her embezzlement devastated her employers, and forced at least two of them to continue working after they expected to retire, so defendant could spend their money on vacations, casinos, and shopping, among other things. These were not large companies able to shrug off the loss of hundreds of thousand dollars. Though defendant's crime, on paper, was committed against businesses, the effects were felt by the individuals who own these businesses. In each case, many obligations of the businesses went unpaid, and the owners were forced to make up the large amounts of missing money in many ways. As W.S., the owner for Forum Design, explains in his victim impact statement, the stolen money was effectively his retirement savings, and he is now 72 years old and cannot retire, and instead must work "indefinitely." Victim Impact Statement of W.S. at 1. As S.K., the owner of Korts & Knight, explains, she had to obtain two different bank loans to sustain her business and, at 71 years old, has to work two jobs, totaling 70 hours per week, to make ends meet. Victim Impact Statement of S.K. at 1–3. The victims also, crucially, lost their faith in themselves and their trust in others. As S.K. explains, she cannot trust or afford a bookkeeper, and, after discovering defendant's fraud, was forced to learn QuickBooks and do her own bookkeeping for her business every night. *Id.* at 2. In S.K.'s words, defendant took "the joy of her life away." *Id.*

Many of the factors discussed above are simply not reflected in the fraud Guidelines range of 41 to 51 months, and support a sentence of 65 months, at the low-end of the total Guidelines range. For example, the substantial financial impact on defendant's victims is not at all reflected in the fraud Guidelines. Defendant caused severe financial hardship to at least two (and likely more) people, but because her crime was committed before U.S.S.G. § 2B1.1(b)(2) was amended to provide for enhancements for crimes involving a "substantial financial hardship" to victims, defendant receives no enhancement under this provision. Had the current version of § 2B1.1(b)(2) applied to defendant, she would have received such an enhancement, and her fraud Guidelines alone would increase by at least +2

**SENTENCING MEMORANDUM**

to a range of 51 to 63 months. Similarly, the repeated nature of defendant's offense and the length of time over which it was committed is not reflected in the 41 to 51 month Guidelines. The instant offense was not a one-off crime, but really four separate crimes, with different victims, committed over many years. Had defendant embezzled $1 million in a single transaction from a large corporation, her fraud Guidelines would likely be the same. Further, the fraud Guidelines of 41 to 51 months do not account for defendant's continued fraud after her arrest, a factor which plainly aggravates the nature of her offense, and, as discussed below, deterrence.

### 2. *History and Characteristics of Defendant*

Defendant's history and personal characteristics also support a lengthy sentence. She is a career fraudster. Her criminal history includes five prior fraud or theft convictions from 1997 to 2005. PSR ¶¶ 40–44. The limited information in the PSR about these convictions indicates that at least one of these prior convictions, like the instant offense, involved taking advantage of other people who trusted her. PSR ¶ 41 (discussing how victims had allowed defendant to stay with them and then how she stole their engagement ring and wallet). Another conviction, like the instant offense, involved fraudulent checks. PSR ¶ 42. Her criminal progression is clear—from a petty fraudster in her 20s, stealing an engagement ring and writing bad checks, to a more sophisticated one in her 30s, embezzling over $1 million over five-and-a-half years.

There is also no indication in her personal history of some larger motivating factor for her pathology that has been, or could be, resolved, or would mitigate her conduct. She had a normal and stable upbringing and a supportive family. PSR ¶¶ 52–53. She has a caring and supportive husband. PSR ¶ 55. Though she has three children, two were born well after the fraud commenced, PSR ¶ 56, and the bank records belie an argument that her crimes were motivated by a need to support her family, as opposed to a desire to selfishly spend on her own travel, clothing, and gambling. Though defendant is participating in counseling and therapy as part of this case, PSR ¶ 63, there is no reason to believe that a few months of counseling will undo the pathology underlying her 18-year criminal career as a fraudster. Being charged in this case and signing a bond promising not to commit any crimes apparently made no difference to her, as she continued to embezzle from Becker Electric while on release in this very case.

Given her history, defendant is a serious risk to reoffend, and the ease with which she repeatedly

**SENTENCING MEMORANDUM**

6

embezzled from different employers and avoided prosecution for half a decade suggests that both specific and general deterrence are important factors in sentencing defendant.

### D. Restitution

In the plea agreement, defendant agreed to restitution of $1,063,975.78. Dkt. 30 at 6–7. This amount covers the money taken from the four victims by defendant.

S.K. and W.S. have identified further, cognizable losses in their victim impact statements as a result of their work to uncover the extent and nature of defendant's fraud. S.K. states that she lost a month of wages at $6,000 to sort out defendant's embezzlement herself. Victim Impact Statement of S.K. at 2. W.S. states that he had to pay $3,000 in attorneys' fees and $4,000 in CPA fees in connection with identifying and investigating the losses in this case. Victim Impact Statement of W.S. at 4.

Under 18 U.S.C. § 3663(b)(4), mandatory restitution should "reimburse the victim for lost income and necessary child care, transportation, and other expenses related to participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." Both S.K. and W.S.'s claimed expenses fall within this category. The total restitution award should be increased by $13,000 ($6,000 for S.K. and $7,000 for W.S.) from the plea agreement amount, for a total restitution order of $1,076,975.78.

## CONCLUSION

With full consideration of all the sentencing factors set forth in 18 U.S.C. § 3553(a), the United States respectfully requests that the Court impose a low-end Guidelines sentence of 65 months of imprisonment, five years of supervised release, $1,076,975.78 in restitution, and a $100 special assessment per count.

DATED: June 1, 2016                           Respectfully submitted,

                                              BRIAN J. STRETCH
                                              United States Attorney


                                              _____/s/_____
                                              BENJAMIN KINGSLEY
                                              Assistant United States Attorney

**SENTENCING MEMORANDUM**